FILED: 1/17/2023 8:41 PM
Vermont Superior Court
Bennington Unit
23-CV-00232

USDC-DVT
2:23-cv-52

**STATE OF VERMONT
SUPERIOR COURT
CIVIL DIVISION**

| | |
|---|---|
| JOHN CHINNICI, | Bennington Unit |
| *Plaintiff*, | Docket No. _____ |
| v. | |
| TOWN OF BENNINGTON, PAUL DOUCETTE, in his individual capacity, LAWRENCE COLE, in his individual capacity, and ANTHONY SILVESTRO, in his individual capacity, | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## INTRODUCTION

1.     This is a civil rights action pursuant to the Vermont Constitution, Vermont Common Law, and 42 U.S.C. § 1983 seeking declaratory relief and monetary damages stemming from Defendants' unconstitutional seizures and searches of Plaintiff John Chinnici arising from his arrest on January 14, 2016, in Bennington, Vermont.

2.     In January of 2016, Bennington police were investigating the armed robbery of two convenience store employees.

3.     The police immediately set their sights on Mr. Chinnici, to the exclusion of more plausible suspects, pressuring witnesses and suspects to implicate him, notwithstanding the fact that the witness descriptions of the armed robber bore no resemblance to Mr. Chinnici.

4.     Mr. Chinnici has maintained his innocence from the first time Bennington police contacted him through the present day.

5.      Using a variety of coercive and unlawful tactics, Bennington police secured evidence that was ultimately used to prosecute Mr. Chinnici, but his resulting conviction was eventually vacated.

6.      Mr. Chinnici now brings this complaint to vindicate his rights to be free from unreasonable searches and seizures under the Vermont and United States constitutions.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this dispute by virtue of 4 V.S.A. § 31.

8.      Venue is proper in this territorial unit of the Court under 4 V.S.A. § 37 and 12 V.S.A. § 402(a) because Defendant Town of Bennington is located in Bennington County.

9.      This Court has personal jurisdiction over Defendants because the Town of Bennington is located in Bennington County and the events that give rise to this action occurred within Bennington County

## PARTIES

10.     At all times relevant to this action, Plaintiff John Chinnici was and is an individual residing in Bennington, Vermont.

11.     At all times relevant to this action, Defendant Paul Doucette was acting under color of law as the Chief of Police of the Bennington Police Department ("BPD") and in the ordinary course and scope of his employment.

12.     Defendant Doucette was and is a "person" for purposes of 42 U.S.C. § 1983.

13.    At all times relevant to this action, Defendant Lawrence Cole was acting under color of law as a Detective with the BPD and in the ordinary course and scope of his employment.

14.    Defendant Cole was and is a "person" for purposes of 42 U.S.C. § 1983.

15.    At all times relevant to this action, Defendant Anthony Silvestro was acting under color of law as a Detective with the BPD and in the ordinary course and scope of his employment.

16.    Defendant Silvestro was and is a "person" for purposes of 42 U.S.C. § 1983.

17.    For the purposes of the state law claims based on the individual Defendants' acts or omissions within the scope of their employment that were not willful or intentional, the Town of Bennington is a proper Defendant under 24 V.S.A. § 940a.

## FACTS

**After a robbery in Bennington, BPD immediately seizes on Mr. Chinnici as a suspect, continuing a targeted campaign against him**

18.    Shortly after midnight on January 11, 2016, Anthony Falace and Scott Galusha, two employees of Martin's Mobil Mini-Mart ("Martin's") at 301 Main Street in Bennington, Vermont, were taking the night deposit to the Citizen's Bank across the street.

19.    Two masked individuals, one armed with a gun, intercepted Falace and Galusha on the street and robbed them.

20.    This robbery came on the heels of several unsolved robberies and burglaries in Bennington.

3

21.    BPD almost immediately singled out Mr. Chinnici in its investigation, to the exclusion of other, more probable suspects, because BPD had *already* targeted him for intense scrutiny and intimidation.

22.    BPD had already been hassling Mr. Chinnici for half a year before the robbery. In July 2015, just three days after Mr. Chinnici had been released from federal custody on an unrelated charge, a BPD officer approached Mr. Chinnici and told him that his federal probation officer was looking for him and that he should call this officer as soon as possible. When Mr. Chinnici called his probation officer, however, he learned that that office had not contacted BPD about Mr. Chinnici at all.

23.    After this interaction, BPD officers continued to harass Mr. Chinnici, telling him at one point that the police did not want people like him in Bennington.

24.    On the morning of January 14, 2016, Mr. Chinnici mentioned that BPD had stopped him recently when he had been walking on the street, simply because, he believed, he was hearing a hood. BPD Det. Lawrence Cole responded that he knew that Mr. Chinnici had been stopped, and it was not because he was wearing it hood; it was, instead, "because we were talking about you. . . . Because you were in our radar sights."

**The descriptions provided by the employees do not match Mr. Chinnici**

25.    After being robbed on the street, Falace and Galusha called 911. Several BPD officers responded to the scene.

26.    When BPD interviewed the Martin's employees, BPD immediately focused their attention on Mr. Chinnici, even though the employees provided descriptions of the robbers that did not match Mr. Chinnici.

27.    Falace, when interviewed by BPD shortly after the robbery, initially described the robber with the gun as follows: he appeared to be a Mexican or Hispanic

male whom he believed he recognized from the state Probation and Parole office[1]; he was about 5'10" tall and weighed about 185-190 pounds.

28.    Falace described the other robber as someone he believed he recognized from school; he was about 6'0" tall and weighed about 150 pounds.

29.    After they gave their initial statements, Falace and Galusha were transported to the BPD station.

30.    By that time, neither Falace nor Galusha had described any characteristic of the gunman that particularly matched Mr. Chinnici. As set forth more fully below, Mr. Chinnici was at least 50 pounds heavier than the person described by Falace, and he would have had no reason to be in the state Probation and Parole office.

31.    At some point, Falace stated that the person he was thinking of from the Probation and Parole office had multiple facial tattoos.

32.    While Falace was awaiting an interview at the BPD station, BPD officers, already targeting Mr. Chinnici, showed him Facebook photos of Mr. Chinnici and his brother, Michael.

33.    Falace was then interviewed by Det. Cole. In this interview, Falace stated that he was focusing on the gunman's voice—a deep voice that sounded "different," with a slight Brooklyn or New York accent—and again stated that he believed he may have recognized this voice from hearing him talk at the state probation and parole office or perhaps at Martin's.

---

[1] In March 2013, Falace pleaded guilty to a state felony and was sentenced to serve two to five years by the Bennington Superior Court, Criminal Division.

34.     As set forth more fully below, Mr. Chinnici does not have a New York, Brooklyn, or, indeed, any discernable accent, and, as BPD knew, would have had no reason to go to the state probation and parole office.

35.     After BPD's suggestive display of Facebook photos of Mr. Chinnici, Falace connected that voice—the voice that he heard at a place Mr. Chinnici would not have frequented and with an accent that Mr. Chinnici did not have—to the Facebook photographs he had been shown of Mr. Chinnici.

36.     After having been shown the Facebook photographs, Falace recollected a previously unmentioned feature of the mystery Hispanic male from the Probation and Parole office, stating that there "was like a mole on this side of his face too. It's like there's a star and there's like a _____ or something."

37.     As depicted in the Facebook photograph BPD showed to Falace, Mr. Chinnici has a star tattoo near his eye.

38.     Falace acknowledged he had not seen a mole or star during the robbery, but, instead, it just "match[ed] in [his] mind, or [his] memory, or whatever" based on the Facebook photo of Mr. Chinnici and the gunman's voice, height, and weight.

39.     As set forth more fully below, neither the distinguishing features of the gunman's voice nor the description of his weight matched Mr. Chinnici.

40.     Falace described the gun used in the robbery as silver.

41.     While being interviewed at the BPD station, Galusha likewise described the gunman as having an accent that made it sound like he was not from this area, perhaps being a Spanish accent.

42.    He stated that both robbers had their faces covered such that he could possibly see only a little bit of skin—so little that he could not even be sure whether the individuals were Black, although he did not believe so.

43.    He further described the gunman as being 5'8" tall and weighing 170-180 pounds.

44.    Galusha described the gun as being a silver automatic.

45.    Galusha described the unarmed robber as being about the same height as, but thinner than, the gunman.

46.    Although Falace and Galusha were not able to offer many details of the gunman's description, nearly every detail provided differed substantially from Mr. Chinnici's description.

47.    Taken together, Falace and Galusha described the gunman as weighing between 170 and 190 pounds.

48.    At the time of the robbery, Mr. Chinnici weighed 240 pounds.

49.    Both employees recall the gunman speaking with an accept, perhaps New York, Brooklyn, or Spanish.

50.    Mr. Chinnici has lived in Vermont since he was two years old.

51.    He does not speak with a New York, Brooklyn, or Spanish accent.

52.    In fact, Mr. Chinnici speaks with no distinctive accent at all.

53.    Other members of Mr. Chinnici's family, including his father, brothers, and uncle Frank Chinnici, do have a New York accent.

54.    Falace stated that he believed he recognized the gunman's voice from running into him at the state probation and parole office.

55.    As BPD was aware, Mr. Chinnici was released from federal custody in July 2015 and was under the supervision of the United States Probation Office, not the State Department of Corrections, and Falace would not have likely encountered Mr. Chinnici at the Bennington County Probation and Parole Office.

56.    As discussed further below, see infra ¶ 88, Mr. Chinnici pointed out some of these discrepancies when first contacted by BPD officers on the morning of January 14, 2016, asking, "So can I ask ah what is being said that make you think I was involved in this? An Hispanic male with a New York accent?"

**BPD tries, and fails, to get Austin Mayhew to name Mr. Chinnici as his accomplice**

57.    In the course of investigating the January 11 robbery, Det. Cole received information connecting Austin Mayhew and his girlfriend, Vanessa Garcia, to other recent robberies in Bennington.

58.    BPD also learned of Mayhew and Garcia's involvement in an incident stemming from a drug transaction on January 3, 2016. BPD applied for and was granted a search warrant for their apartment located at 214 Main Street based on this drug offense.

59.    On the morning of January 14, 2016, BPD executed the search warrant, seizing, among other items, three cell phones and arresting both Mayhew and Garcia.

60.    Det. Anthony Silvestro interviewed Mayhew beginning around 7:00am.

61.    Silvestro read Mayhew his *Miranda* rights, which he waived. Silvestro advised Mayhew that he could invoke his *Miranda* rights at any time: "You can invoke these rights at any point. We can be 30 seconds into the conversation, and you can invoke any of these rights, and the conversation's over, okay? . . . At any point you want

8

to end the conversation, you have the right to do that. You just have to say: Detective Silvestro, I'm done."

62. After discussing the drug offense, Silvestro turned the conversation the unsolved robberies in Bennington and then immediately questioned Mayhew about his connection with Mr. Chinnici.

63. Silvestro asked Mayhew whether he or Garcia had been involved in the recent robberies, including the January 11 Martin's robbery; Mayhew denied any involvement and said he had no knowledge that Garcia had been involved, either.

64. Det. Cole interviewed Garcia beginning at 6:46am[2] on January 14, 2016.

65. Cole read Garcia her *Miranda* rights. She declined to waive those rights; when asked whether she understood the rights she was being asked to waive, she clearly stated: "Yes, but I don't want to waive my right."

66. Cole nevertheless pushed her to talk, asking, "so you don't want to talk about why we're here and give your own version?"

67. Garcia again clearly declined to waiver her rights: "No, I don't want to answer any questions." When Cole asked if she was sure, Garcia responded, "Not without a lawyer, or attorney."

68. Garcia wrote on the *Miranda* waiver form, "I do not wish to talk."

69. BPD policy requires questioning to immediately cease when an individual invokes their right to remain silent or have an attorney present during a custodial investigation: "Once an individual indicates a desire to remain silent or clearly requests

---

[2] Cole recorded this and several other interviews on an audio recorder with a time and date stamp. The chronology of events and circumstantial evidence shows that the recorder's clock was running one hour fast. For example, this interview is time-stamped 7:46am, but Garcia signed a *Miranda* form at the beginning of the interview at 6:47am.

to speak with an attorney, **you must immediately stop questioning**" (emphasis in original).

70.    Notwithstanding Garcia's repeated invocation of her *Miranda* rights, and contrary to BPD policy, Cole persisted in interrogating her.

71.    Immediately after Garcia invoked her rights and Cole told her that she did not have to talk, he began questioning her, asking, "What do you think Austin's gonna be saying?," and continued questioning her at length.

72.    When Garcia expressed confusion about "what this is even about," Cole told her he wanted to cover "many different things," including any statements made by Mayhew and "John."[3]

73.    After discussing the drug transaction and the ongoing search of the Mayhew/Garcia apartment, Cole abruptly shifted the conversation to Mr. Chinnici, asking first what Garcia's relationship to him was. She explained that they are cousins.

74.    Garcia also explained that she, Mayhew, and Mr. Chinnici had gone to Dover, Vermont, on the evening of January 10 to get pizza around 8pm and then returned to Bennington.

75.    Despite Cole's repeated insinuations to the contrary, Garcia continually denied any knowledge of or involvement in the Martin's robbery, as well as other recent robberies in Bennington.

76.    Toward the end of the interview, Garcia again invoked her *Miranda* rights, stating, "I don't want to answer any more questions." Cole nevertheless persisted in interrogating her.

---

[3] Presumably Mr. Chinnici, although this name was brought up without any additional context at this point.

2card

77.    This interview ended without Garcia implicating Mr. Chinnici in the January 11 robbery.

78.    After interviewing Garcia, Cole interviewed Mayhew again.

79.    Mayhew again denied involvement in or knowledge of a series of earlier robberies in Bennington.

80.    Like Garcia, Mayhew told Cole that he, Garcia, and Mr. Chinnici had gone to Dover for pizza and returned to Bennington. He also said Mr. Chinnici came into their apartment for a short time and then left.

81.    Cole then accused Mayhew of having committed the January 11 Martin's robbery with Mr. Chinnici, which Mayhew denied.

82.    Mayhew invoked his *Miranda* rights, stating, as instructed by Silvestro, that he was done answering questions: "I wasn't there. I didn't do it. And that's the last thing I'm saying about it. . . . [T]hat's all I have to say. I'm done."

83.    Despite Mayhew's invocation of his *Miranda* rights, and contrary to BPD policy, Cole persisted in interrogating Mayhew. However, and despite Cole's persistent suggestions, Mayhew did not implicate Mr. Chinnici in the January 11 robbery.

84.    After multiple rounds of interviews, and despite the BPD Detectives' insistence, neither Mayhew nor Garcia had connected Mr. Chinnici to the robbery.

**BPD interviews Mr. Chinnici, who repeatedly denies involvement in or knowledge of the January 11 robbery**

85.    On the morning of January 14, Cole and Silvestro went to Mr. Chinnici's parents' house, where Mr. Chinnici was residing, to interview Mr. Chinnici.

86.    When Mr. Chinnici asked why Cole and Silvestro wanted to know his whereabouts on the night of January 10 into January 11, they explained they were

investigating an armed robbery involving "a Hispanic-looking guy with a New York accent."

87.    Mr. Chinnici denied any involvement in or knowledge of the robbery: "I believe I'm pretty identifiable. And it definitely wasn't me. . . . I don't know what the heck you guys are questioning me for. . . ."

88.    Mr. Chinnici correctly pointed out that he did not match the details they provided of the gunman: "So, could I just ask, what, what is being said that makes you think that it's me involved in this? An Hispanic male with a New York accent?"

89.    Cole and Silvestro would have heard that Mr. Chinnici had no discernable accent.

90.    Mr. Chinnici expressed surprise and frustration that there was not surveillance footage available from the bank that BPD could review, which he believed would definitively rule him out.

**BPD again tries—and again fails—to get Mayhew to name Mr. Chinnici as his accomplice**

91.    At some point after Cole and Silvestro left for the Chinnici residence, Chief Doucette met privately with Mayhew to question him about the January 11 robbery.

92.    As noted above, this interview subsequent to Mayhew's invocation of his *Miranda* rights violated BPD policy.

93.    Doucette did not record or take any notes memorializing this private interview.

94.    By all appearances, Doucette met with Mayhew in this private, unrecorded, unmemorialized, contrary-to-BPD policy session to further pressure Mayhew into implicating Mr. Chinnici, something BPD had not been able to accomplish.

95.    Mr. Chinnici has been informed that Doucette told Mayhew that, if Mayhew did not mention Mr. Chinnici's uncle, Frank Chinnici, and instead named Mr. Chinnici as his accomplice, Doucette would make sure that Mayhew would stay out of jail as long as he stayed out of any further trouble and BPD would not charge Garcia with any of the crimes. BPD had a special relationship with Frank Chinnici that incentivized BPD to protect him from being charged with any offenses.

96.    Subsequently, beginning at 11:45am[4] on January 14, Cole, Doucette, and another individual interrogated Mayhew again, this time back on the record.

97.    Doucette claimed that Mayhew had named "Chinnici" as the other robber during their private, unrecorded, unmemorialized interview, and implied that he had named John Chinnici specifically. At some point in this interview, Doucette left the room.

98.    Mayhew repeatedly denied that he had named Mr. Chinnici as the other robber during his private conversation with Doucette; in fact, Mayhew denied that he had named anyone at all and stated instead that he simply told Doucette that he (Mayhew) was there, that he was with somebody, and that he was not the one with the gun.

99.    Cole called Doucette and explained that Mayhew was not naming, and stated that he never named, Mr. Chinnici. Doucette again tried to convince Mayhew that he had named "Chinnici" and reminding him that he had been with "the freak"— meaning Mr. Chinnici—on the morning of January 12, likely referring to footage of the

---

[4] 12:45pm per the recorder's time stamp.

two men getting coffee together at Hemming's gas station and store, next door to the Mayhew/Garcia apartment.

100.    The officers continued to pressure Mayhew to name Mr. Chinnici, including by implying at various times that they could protect him from the Chinnici family, keep him out of jail, and keep Garcia out of jail.

101.    In the face of Mayhew's continued denials, Cole then changed tack, noting that there are three Chinnici brothers—John, Michael, and Eddie—and asking whether his accomplice was any one of those three men.

102.    At this point, Mayhew asked, "Aren't I allowed to get a lawyer," a request the officers brushed past.

103.    Cole then asked whether Mayhew would name his accomplice if he could get assurances from the State's Attorney that Mayhew would be able to "walk out of here today" rather than going straight to jail. Cole noted that, without BPD's intercession, Mayhew could be held without bail, but if he named his accomplice, BPD could likely see to it that he and Garcia would be released on conditions.

104.    The interview ended again without Mayhew naming his accomplice or implicating Mr. Chinnici.

**BPD arrests Mr. Chinnici absent probable cause even though—and despite BPD's best efforts—Mayhew had not identified Mr. Chinnici (or anyone else) as his accomplice**

105.    On the afternoon of January 14, many members of the Chinnici family, including Mr. Chinnici, arrived at the Bennington state office complex for a family court hearing. At the same time, Mayhew was at the Bennington Superior Court, Criminal Division, for his arraignment. The court is located in the Bennington state office complex.

14

106.    While in the courthouse, Mr. Chinnici was surrounded by a dozen or more BPD officers, placed up against the wall, and searched. Doucette advised Mr. Chinnici that he was being placed under arrest for assault and armed robbery and then placed him in handcuffs.

107.    According to a report filed at 4:02pm on January 14, at approximately 3:00pm, BPD transported Mr. Chinnici (whom the report referred to as "the accused") from the state office complex to the BPD station, where he was escorted to processing, placed in a temporary holding cell, and relieved of his personal property.

108.    Once Mr. Chinnici arrived at the station, Det. Cole completed his processing. In an arrest custody report, Cole indicated that he had arrested Mr. Chinnici[5] at 3:30pm on January 14. This report stated that Mr. Chinnici was 5'9" tall and weighed 240 pounds at the time of his arrest. The charges listed in the report were the January 11 Martin's robbery and a misdemeanor charge of providing false information to the police on January 14 at 6:00pm.

109.    At the time of Mr. Chinnici's arrest, Mayhew still had not named an accomplice, and BPD had no probable cause to arrest him.

**After Mr. Chinnici's arrest, BPD continues to pressure Mayhew to name him as his accomplice**

110.    At 3:18pm,[6] after Mr. Chinnici had been arrested, Cole and Doucette again interrogated Mayhew, again pressuring him to name his accomplice. After BPD had repeatedly ignored Mayhew's invocation of his *Miranda* rights during earlier interrogations, Mayhew's attorney was finally present for this interview.

---

[5] Presumably meaning he had taken custody of Mr. Chinnici from the transporting officer.
[6]  4:18pm per the recorder's time stamp.

111.    During this interrogation, Cole recounted the conversation he allegedly had with Mayhew's attorney just prior to the interview. He stated that he had been explaining a deal, whereby Mayhew and Garcia could get favorable treatment on the potential matters against them and their conditions of release, when "the Chinnici clan" walked into the courthouse. Cole had further suggested that, if Mayhew would "put a first name in front of the Chinnici name" and that person was in the courthouse, they could arrest him right then and there. Cole stated that Mayhew had a problem with that and wanted to speak to a family member or Garcia before continuing.

112.    Cole stated that the whole Chinnici family was at the courthouse for family court and that Mayhew "freaked out" when he saw them, a claim that Mayhew denied.

113.    Doucette again pressured Mayhew to name Mr. Chinnici specifically: "If you're worried about him, then we need the name officially on the record that it was him and that's all I'm asking you to do. . . . I mean it's, we talked about it in my office and I know you're scared, but John Chinnici is the freak. We know that, but you gotta be the one to officially say it. He had the gun. Not you."

114.    After Mayhew continued to refuse to name Mr. Chinnici as his accomplice, Doucette tried one more time to get Mayhew to implicate *any* member of the Chinnici family: "You've admitted that you were there, you admitted you picked up the bank bag, you admitted to not quite splitting. You got the money that Chinnici gave you, but we need you to put a name to Chinnici. There's plenty of Chinnicis. But you need to put a name to it. Who was with you at Citizen's Bank the night that you picked the bank bag up off the ground and then ran?"

115.    At this point, the interview ended with Mayhew's attorney asking for time to speak to his client.

16

116.     After a brief break, the interview resumed at 3:39pm.[7]

117.     Det. Cole immediately asked Mayhew who was with him at the Citizen's Bank, and Mayhew finally claimed—more than 30 minutes *after* BPD arrested Mr. Chinnici—that it was Mr. Chinnici.

118.     BPD interviewed Mayhew again at 4:13pm[8] on January 14. Mayhew described the gun used in the robbery as a silver automatic, "pretty small" but "not crazy small" with "a shorter barrel."

**BPD interrogates Mr. Chinnici following his arrest without probable cause**

119.     Chief Doucette and Det. Cole took a sworn statement from Mr. Chinnici—who had remained in BPD custody since his arrest—beginning at 6:30pm on January 14.

120.     Doucette informed Mr. Chinnici that he would likely remain in BPD custody overnight.

121.     Doucette began the interrogation by telling Mr. Chinnici that "I'm not going to lie to you. I'm, I'm not going to tell you I have things I don't have . . . ."

122.     Doucette read Mr. Chinnici his *Miranda* rights.

123.     Doucette told Mr. Chinnici that Mayhew had admitted his involvement in the robbery and named Mr. Chinnici as the gunman.

124.     Despite Doucette's persistent efforts, Mr. Chinnici denied any involvement in the January 11 Martin's robbery.

125.     Mr. Chinnici stated that he called Mayhew and Garcia on the morning of January 11, as he had loaned them money to help them avoid eviction, and they had failed to repay him as promised. They had made a partial payment on the night of the

---

[7] 4:39pm per the recorder's time stamp.
[8] 5:13pm per the recorder's time stamp.

10th when they were in Dover for pizza and stated that they would pay him the rest in the morning.

126.    Mr. Chinnici stated that he went to the Mayhew/Garcia apartment on the morning of the 11th to get the rest of the money, which they gave him. He and Mayhew then went out for coffee.

127.    Doucette then told Mr. Chinnici—untruthfully—that the clerk from the store identified him as the gunman by the star tattoo under his eye.

128.    Doucette and Cole told Chinnici that the clerk said the gunman had a New York accent. Mr. Chinnici correctly pointed out that he does not have a New York accent.

129.    After Mr. Chinnici continued to deny involvement, Cole asked him whether the gunman may have been one of his brothers, noting that Mayhew "had a hard time putting your name in front" of "Chinnici." Mr. Chinnici refused to talk about members of his family.

130.    Mr. Chinnici offered to wear a wire when talking to Mayhew to prove that Mayhew had falsely implicated him.

131.    After the interview terminated, Mr. Chinnici was taken back to the holding cell.

132.    Information obtained from this interview was introduced and relied on at trial.

**BPD's probable cause affidavits in support of its applications to search Mr. Chinnici's cell phone contains material misrepresentations and omissions**

133.    Once Mr. Chinnici was placed in a holding cell, Mr. Chinnici requested that his cell phone be brought to the station, in part because Mr. Chinnici believed it contained exculpatory evidence. Cole called Mr. Chinnici's father and asked that he

bring in the cell phone, which he did. After Mr. Chinnici looked at the phone, Cole seized it and requested Mr. Chinnici's consent to search it using Cellebrite software.[9] Mr. Chinnici did not consent to this search.

134.    On January 15, 2016, Det. Cole filed an affidavit in support of his application for a search warrant for a forensic search of Mr. Chinnici's cell phone for evidence related to several robberies and burglaries in Bennington, including the January 11 Martin's robbery.

135.    This affidavit included no information suggesting that Mr. Chinnici was involved in, or suspected of being involved in, any of the other robberies or burglaries.

136.    This affidavit included multiple material misrepresentations and excluded multiple material facts that undermined Cole's claimed belief that Mr. Chinnici was involved in the January 11 robbery.

137.    As described above, Falace and Galusha described the gunman as being 5'8" to 5'10" tall and weighing between 170-190 pounds. When Cole processed Mr. Chinnici at the station, he noted that Mr. Chinnici weighed 240 pounds.

138.    Rather than include this significant discrepancy in his affidavit, Cole instead falsely claimed that the employees "had limited information about [the gunman's] height and weight" and did not mention Mr. Chinnici's weight.

139.    Both employees described the gunman as having an accent, possibly a New York, Brooklyn, or Spanish accent. This affidavit is identical to the probable cause affidavit Cole submitted on January 15 along with the information charging Chinnici with committing the January 11 robbery and providing false information to police.

---

[9] As set forth further below, ¶ 159 n.11, BPD later lost Mr. Chinnici's cell phone, and it has not since been located.

140.    In his affidavit, Cole noted the suggestion of only a New York accent, and stated, "I know [John] Chinnici and his family originate from the New York City area. I do not know John Chinnici from any past interactions, but I have had multiple interactions with his father and brothers, who have a New York accent."

141.    Despite the fact that Cole had by this point spoken with Mr. Chinnici on January 14 both at his home and at the police station, and despite the fact that Mr. Chinnici himself had at least twice pointed out that he did not have a New York accent, Cole omitted the fact, known to him, that Mr. Chinnici did not speak with a New York or any other discernable accent.

142.    Cole did not include any information in his affidavit about BPD having shown Falace photos from Facebook of Mr. Chinnici.

143.    After the January 11 robbery, Cole received a call from Donna Chinnici, Mr. Chinnici's aunt, who lived in New Jersey. Donna Chinnici told Cole that, a few days before the January 11 robbery, her brother, Frank Chinnici, had held "a gun with a silver barrel" to her head and then departed the area in a Cadillac.

144.    Frank Chinnici was known to drive a Cadillac in the Bennington area.

145.    Frank Chinnici grew up in New York City and speaks with a Brooklyn accent.

146.    Frank Chinnici is 5'9" tall and weighs 180 pounds.

147.    Frank Chinnici has spent time in Bennington and was known to BPD, having been arrested by BPD and charged with heroin possession in May 2014. BPD officers, having interviewed him after this arrest, would have been aware of his Brooklyn accent.

20

148.    Moreover, Frank Chinnici and BPD had a special relationship that both put BPD on notice of his weight and accent and gave BPD an incentive to protect him from any new criminal charges.

149.    Cole did not include any information about Frank Chinnici—that he was reported to possess a silver handgun, that he was reported to have held this handgun to his sister's head just a few days prior to the robbery, that he had a Brooklyn accent, that he was the same height and weight as the gunman as described by both Martin's employees, and that BPD had a motive to ensure he was not charged in the robbery—in his affidavit.[10]

150.    On information and belief, notwithstanding these facts, BPD did not take any steps to investigate whether Frank Chinnici may have been Mayhew's accomplice.

151.    Cole knew that Mayhew's story changed dramatically between different interviews on January 14, but he did not include this knowledge in his affidavit. On the contrary, Cole falsely implied that there had only been one interview, and that, in that single interview, Mayhew admitted his involvement in the January 11 robbery, named Mr. Chinnici as his accomplice, and described many other details of the robbery.

152.    Cole did not include any information about the multiple times Mayhew denied any involvement in the January 11 robbery or the multiple times Mayhew refused to name the other robber.

---

[10] On November 14, 2015, fewer than two months before the robbery, Frank Chinnici changed his Facebook cover photo to one of a silver handgun matching the detailed descriptions given by Falace and Mayhew. Cole did not mention this image in his affidavit, but it is not presently known whether or when BPD became aware of this photo.

153.    Cole also did not include any information about the threats and promises BPD had made to Mayhew in order to secure his claim that Mr. Chinnici was the other robber.

154.    Cole was also aware that Mayhew was lying about at least some circumstances of the robbery. In an interview with BPD at 4:13pm on January 14, Mayhew stated that, after he, Garcia, and Mr. Chinnici returned from getting pizza in Dover, they hung out at the Garcia/Mayhew apartment until shortly before midnight, when he and Mr. Chinnici left on foot and walked down Main Street to the area of Martin's, which is located approximately 0.3 miles to the east.

155.    The Mayhew/Garcia apartment is next door to and just west of Hemming's gas station and store, located at 216 Main Street in Bennington.

156.    Det. Cole reviewed exterior surveillance footage from a Hemming's camera that was pointed toward the apartment.

157.    This footage does not show Mayhew and Chinnici leaving the apartment on foot and passing in front of Hemming's, as it would have if Mayhew's claim were true.

158.    Cole did not include this fact in his affidavit.

159.    After the superior court granted this search warrant on the basis of the misleading and incomplete affidavit, Det. Silvestro performed file and logical searches of Mr. Chinnici's cell phone using Cellebrite software.[11] Evidence from this search was introduced and relied on at trial.

---

[11] The searches BPD performed were not capable of retrieving most deleted data or data from certain third-party applications. Mr. Chinnici believed that exculpatory evidence was contained in messages on the third-party application Facebook Messenger. Unfortunately for Mr. Chinnici, however, BPD claimed to have inexplicably lost his cell phone, depriving him of the opportunity to pursue this evidence. To date, BPD has still not located this phone.

160.     This affidavit is identical to the probable cause affidavit Cole submitted on January 15 along with the information charging Chinnici with committing the January 11 robbery and providing false information to police.

161.     On February 23, 2016, Det. Silvestro applied for a search warrant for cell site location information for Mr. Chinnici's cell phone from January 9 through January 12, 2016.

162.     Silvestro's affidavit in support of this application attached and incorporated Cole's January 15 affidavit, with all its material misrepresentations and omissions.

163.     The evidence obtained from these searches included detailed information about Mr. Chinnici's movements, personal and private text messages he had sent and received, internet searches he had performed, and a wealth of other personal information of the sort typically found on a personal cell phone.

164.     Evidence from this search was introduced and relied on at trial.

**The criminal proceedings against Mr. Chinnici ended with dismissal of the robbery charge**

165.     Mr. Chinnici was arraigned in state criminal court on January 15, 2016, on charges of assault and robbery with a weapon, 13 V.S.A. § 608(b), and providing false information to an officer to implicate another, 13 V.S.A. § 1754(a).

166.     Based on the information provided in Cole's January 15 probable cause affidavit, the court found probable cause existed as to both counts.

167.     Mr. Chinnici was ordered held on $100,000 bail, an amount that was subsequently reduced to $50,000.

168.    On July 10, 2017, federal prosecutors charged Mr. Chinnici with obstructing commerce by robbery, 18 U.S.C. § 1951, relating to the January 11 Martin's robbery.

169.    The State dismissed both state charges on July 12, 2017.

170.    On July 27, after a five-day jury trial in the District Court for the District of Vermont, Mr. Chinnici was convicted of obstructing commerce by robbery.

171.    On December 21, 2018, Mr. Chinnici filed a motion for a new trial, followed by supplemental filings on June 19, 2019, August 1, 2019, September 6, 2019, and October 3, 2019, alleging several ineffective assistance of counsel claims and discovery violations by the prosecution as well as citing newly discovered evidence.

172.    On December 19, 2019, the district court granted Mr. Chinnici's motion for a new trial on the ground that Mr. Chinnici's prior waiver of his trial counsel's conflict of interest was not knowing and intelligent. *United States v. Chinnici*, 431 F. Supp. 3d 470 (D. Vt. 2019).

173.    The court held that counsel's prior representation of Galusha created a conflict insofar as rigorous cross-examination of Galusha could have been "used to undercut Mr. Mayhew's highly incriminating testimony at trial. If Mr. Mayhew was discounted by the jury as a truthful source of information regarding the crime, the government would have had scant evidence left on the pivotal issue of the identification." *United States v. Chinnici*, 431 F. Supp. 3d 470, 486-87 (D. Vt. 2019) (citation omitted).

174.    Specifically, "[i]n the course of trial and in the evidence obtained thereafter, it became clear that Mr. Mayhew and Mr. Galusha's relationship was not attenuated but, rather, that they were both implicated in the November 2015 burglary of

24

Martin's, had close familial ties, and appeared to have communicated numerous times the morning after the robbery which would be unusual if they were perpetrator and victim. Because Mr. Mayhew was testifying under a grant of immunity, only Defendant would suffer the consequences if the jury found Mr. Mayhew's testimony credible. Fully exposing the Galusha-Mayhew relationship may have enabled [trial counsel] to damage the credibility of Mr. Mayhew, the government's primary witness. If the jury discounted Mr. Galusha's testimony as an insider, they would be left with only Mr. Falace's vague description of the robber with the gun to find Defendant guilty beyond a reasonable doubt." *United States v. Chinnici*, 431 F. Supp. 3d 470, 485 (D. Vt. 2019).

175.    The district court did not rule on the merits of the remaining ineffective assistance of counsel claims, finding no prejudice because these claims would not "address the primary evidence of Defendant's guilt which consisted of Austin Mayhew's testimony that he had committed the robbery with Defendant." *United States v. Chinnici*, 431 F. Supp. 3d 470, 483 (D. Vt. 2019).

176.    Mr. Chinnici's conviction was therefore vacated.

177.    On January 17, 2020, the federal government charged Mr. Chinnici by information with using a cell phone in the commission of the offense of distribution of Oxycodone.

178.    That same day, Mr. Chinnici pleaded guilty to the new charge, and the district court sentenced him to time served plus one year of supervised release.

179.    The government dismissed the count related to the January 11 Martin's robbery.

180.    Mr. Chinnici was immediately released from custody that same day—after spending more than four years in prison.

25

## CLAIMS FOR RELIEF

181.    To the extent that state law claims fall within the exclusivity provision of 24 V.S.A. § 901a, those claims are brought against the Town of Bennington only.

## COUNT I – Defendants' Arrest of Mr. Chinnici Absent Probable Cause Violated His Rights to Be Free from Unreasonable Seizure and False Arrest

*(Pursuant to Article 11 of the Vermont Constitution, Tort of False Arrest, 42 U.S.C. § 1983)*

Defendants Doucette, Cole, Town of Bennington

182.    The foregoing paragraphs are incorporated by reference as if set forth at length here.

183.    Mr. Chinnici has a constitutionally protected interest in being free from unreasonable seizures under the Fourth Amendment to the U.S. Constitution and Article 11 of the Vermont Constitution.

184.    At the time that BPD arrested Mr. Chinnici, they had a description from the employees that did not match Mr. Chinnici; Mr. Chinnici's denial of involvement; and Mayhew's admission to participating in the robbery with an as-yet-unnamed individual.

185.    At the time that BPD arrested Mr. Chinnici, they lacked probable cause to believe he had committed the January 11 robbery, thereby violating his right to be free from unreasonable seizures.

186.    The unlawful arrest of Mr. Chinnici constituted a false arrest by Defendants of Mr. Chinnici.

187.    As a result of Defendants' violation of his rights, Mr. Chinnici has suffered damages.

**COUNT II – Defendants' Custodial Interrogation of Mr. Chinnici Following His Arrest Without Probable Cause Violated His Right to Be Free from Unreasonable Seizures**

*(Pursuant to Article 11 of the Vermont Constitution and 42 U.S.C. § 1983)*

Defendants Doucette, Cole, Town of Bennington

188.    The foregoing paragraphs are incorporated by reference as if set forth at length here.

189.    Mr. Chinnici has a constitutionally protected interest in being free from unreasonable seizures under the Fourth Amendment to the U.S. Constitution and Article 11 of the Vermont Constitution.

190.    Custodial interrogation following a seizure or arrest without probable cause is an unreasonable seizure unless the taint of the initial arrest had been purged prior to the interrogation.

191.    The taint of the unlawful seizure had not been purged when Doucette and Cole interrogated Mr. Chinnici; the interrogation therefore violated his right to be free from unreasonable seizures.

192.    As a result of Defendants' violation of his rights, Mr. Chinnici has suffered damages.

**COUNTS III and IV – Defendants' Searches of Mr. Chinnici's Cell Phone Pursuant to Warrants Obtained Based on Affidavits Rife with Material Misrepresentations and Omissions Violated Mr. Chinnici's Right to Be Free from Unreasonable Searches**

*(Pursuant to Article 11 of the Vermont Constitution and 42 U.S.C. § 1983)*

Defendants Cole, Silvestro, Town of Bennington

193.    The foregoing paragraphs are incorporated by reference as if set forth at length here.

194.    Mr. Chinnici has a constitutionally protected interest in being free from unreasonable searches under the Fourth Amendment to the U.S. Constitution and Article 11 of the Vermont Constitution.

195.    A forensic search of a cell phone pursuant to a search warrant obtained on the basis of materially false and inaccurate information is an unreasonable search.

196.    On January 15, 2016, Det. Cole submitted an application for a search warrant to perform a forensic search of Mr. Chinnici's cell phone.

197.    On February 23, 2016, Det. Silvestro submitted an application for a search warrant for cell site location information for Mr. Chinnici's cell phone.

198.    Both applications contained false and misleading information known to them to be false and misleading.

199.    Both applications also excluded material, exculpatory information known to them.

200.    Had the applications excluded the false and misleading information and included the exculpatory information, the search warrant applications would have been denied.

201.    The forensic search of Mr. Chinnici's cell phone pursuant to the warrant issued based on Cole's January 15 affidavit violated his right to be free from unreasonable searches (Count III).

202.    The search for cell site location information for Mr. Chinnici's cell phone pursuant to the warrant issued based on Silvestro's February 23 affidavit and incorporated Cole affidavit violated his right to be free from unreasonable searches (Count IV).

203.    As a result of Defendants' violations of his rights, Mr. Chinnici has suffered damages.

## REQUEST FOR RELIEF

Mr. Chinnici requests that this Court issue the following relief:

1.  A declaration that Defendants violated Mr. Chinnici's rights under Article 11 of the Vermont Constitution and the Fourth Amendment of the United States Constitution in arresting him without probable cause, interrogating him subsequent to his arrest without probable cause, and causing to be performed searches of Mr. Chinnici's cell phone on the basis of materially misleading and incomplete affidavits;

2.  Compensatory and punitive damages;

3.  The costs and expenses of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

4.  Any further relief that the Court determines to be just and equitable.

## JURY DEMAND

Plaintiff John Chinnici demands a jury trial on all counts so triable.


　　  /s/ Lia Ernst
      Lia Ernst
      Hillary Rich
ACLU Foundation of Vermont          *Counsel for John Chinnici*
      PO Box 277
   Montpelier, VT 05601             Dated: January 17, 2023
    (802) 223-6304
    lernst@acluvt.org
    hrich@acluvt.org